UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------------x

NEW YORK CRUISE LINES, INC.; CIRCLE LINE   :
SIGHTSEEING YACHTS, INC.; WORLD YACHT, LLC,   :
  :
                     Plaintiffs,   :
  :
        -against-   :       No.13 Civ. 08145  (AT)
  :
HUDSON RIVER PARK TRUST,   :      Hon. Analisa Torres
  :
                  Defendant.   :
  :
  :
------------------------------------------------------------------X

## DEFENDANT HUDSON RIVER PARK TRUST'S
## MEMORANDUM OF LAW IN SUPPORT OF MOTION
## TO DISMISS

ERIC T. SCHNEIDERMAN
Attorney General of the
  State of New York
<u>Attorney for Defendant Hudson</u>
  <u>River Park Trust</u>
120 Broadway, 24th Floor
New York, New York 10271-0332
(212) 416-8538

ELIZABETH A. FORMAN
Assistant Attorney General
  <u>of Counsel</u>

## TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ............................................................................. iii

Preliminary Statement ......................................................................................1

Statement of the Case .......................................................................................4

    A.  The HRPA and The Trust ...................................................................4

    B.  The 2013 Amendments to the HRPA ..................................................5

    C.  Plaintiffs' Lease .................................................................................8

    D.  The Complaint ...................................................................................9

        1.  Factual Allegations ......................................................................9

        2.  Legal Claims ..............................................................................10

Legal Background............................................................................................11

    A.  User Fees And Their Constitutionality ............................................11

    B.  The Fact-Specific Test For User Fees Under the Tonnage Clause
        Commerce Clause, Right to Privacy and MTSA.............................14

Argument .......................................................................................................20

Point I   -  THE COMPLAINT DOES NOT SET OUT A VIABLE
            FACIAL CONSTITUTIONAL CHALLENGE TO § 7(1)(k) .......................20

Point II  -  ANY AS-APPLIED CLAIM MUST BE DISMISSED
            BECAUSE IT IS UNRIPE .................................................................22

    A.  Plaintiffs Bear the Burden of Proving Ripeness .........................23

    B.  Plaintiffs' As-Applied Claims Are Unripe .................................23

        1.  Plaintiffs' Claims Are Not Fit For Determination Because They
            Require A Fact-Specific Analysis Of  The Terms And Use Of
            A Non-Existent Fee ...........................................................23

2. Dismissal At This Time Would Not Impose Any Significant
   Hardship On Plaintiffs ........................................................................29

3. The Claim that the Statute Is Unconstitutional As Applied Is
   Also Constitutionally Unripe............................................................32

POINT III - THE CLAIM OF PREEMPTION IS EITHER MERITLESS
   OR UNRIPE ................................................................................................35

   A. Plaintiffs' Preemption Challenge to the Statute Fails to State
      A Cause of Action ..........................................................................35

   B. Plaintiffs' Claim that the Application of the Statute to It Violates
      or Is Preempted By MTSA Is Unripe ..........................................37

CONCLUSION ..........................................................................................................38

## TABLE OF AUTHORITIES

**Cases**                                                        **Page(s)**

Abbott Labs v. Gardner,
  387 U.S. 136 (1967), overruled on other grounds by Califano v. Sanders, 430
  U.S. 99 (1977) ...................................................................................................22, 24

Ada v. Guam Soc'y of Obstetricians & Gynecologists,
  506 U.S. 1011 (1992) ....................................................................................................20

American Trucking Assoc. v. Scheiner,
  483 U.S. 266 (1987) ......................................................................................................13

Automobile Club of New York, Inc. v. Port Authority,
  887 F.2d 417 (2d Cir. 1989) .........................................................................................16

Bridgeport & Port Jefferson Steamboat Co. v. Bridgeport Port Auth.,
  566 F. Supp. 2d 81 (D. Conn. 2008), aff'd, 567 F.3d 79 (2d Cir. 2009) ........................passim

Bridgeport and Port Jefferson Steamboat Co. v. Bridgeport Port Authority,
  567 F.3d 79 (2d Cir. 2009) .........................................................................................passim

Building Trades Employers' Educ. Ass'n. v. McGowan,
  2000 U.S. Dist. LEXIS 14270 (S.D.N.Y. 2000)..............................................................37

Cal. Coastal Com v. Granite Rock Co.,
  480 U.S. 572 (U.S. 1987) .............................................................................................35

Camara De Mercadeo v. Vazquez,
  2013 U.S. Dist. LEXIS 150275 (D. P. R. Oct. 16, 2013) ................................................15

Clearing House, LLC v. Cuomo,
  510 F.3d 105 (2d Cir. 2007) .........................................................................................34

Clyde Mallory Lines v. Alabama ex rel. State Docks Comm'n,
  296 U.S. 261 (1935) ..........................................................................................13, 14, 15

Commonwealth Edison Co. v. Montana,
  453 U.S. 609 (1981) ......................................................................................................11

Complete Auto Transit Inc. v. Brady,
  430 U.S. 274 (1977) ......................................................................................................13

Connecticut v. Duncan,
  612 F.3d 107 (2d Cir. 2010) ................................................................................24, 25, 32

Cranley v. Nat'l Life Ins. Co.,
  318 F.3d 105 (2d Cir. 2003) ..................................................................................21

CSX Transp., Inc. v. Easterwood,
  507 U.S. 658 (1993) ...........................................................................................35

Diaz v. Paterson,
  547 F.3d 88 (2d Cir. 2008) ..................................................................................20

Dickerson v. Napolitano,
  604 F.3d 732 (2d Cir. 2010) ................................................................................21

Entergy Nuclear Vt. Yankee, LLC v. Shumlin,
  733 F.3d 393 (2d Cir. 2013) ..........................................................24 26 28, 34

Evansville-Vanderburgh Airport Authority v. Delta Airlines, Inc.,
  405 U.S. 707 (1972) ......................................................................................13, 18

Hawaiian Navigable Waters Pres. Soc'y v. State of Hawaii,
  823 F. Supp. 766 (D. Haw. 1993)........................................................................15

High Country Adventures, Inc. v. Polk,
  2008 WL 4853105 (Tenn. Ct. App. Nov. 10, 2008)........................................36, 37

In re Drexel Burnham Lambert Group, Inc.,
  995 F.2d 1138 (2d Cir. 1993) ..............................................................................27

Isaacs v. Bowen,
  865 F.2d 468 (2d Cir. 1989) ..........................................................................25, 27

Lujan v. Defenders of Wildlife,
  504 U.S. 555. . . (1992) ........................................................................................33

Makarova v. United States,
  201 F.3d 110 (2d Cir. 2000) ................................................................................23

Malik v. Meissner,
  82 F.3d 560 (2d Cir. 1996) ..................................................................................23

Marchi v. Board of Cooperative Education Services of Albany,
  173 F.3d 469 (2d Cir. 1999) ..........................................................................23, 26

Maryland v. Louisiana,
  451 U.S. 725 (1981) ............................................................................................35

Mass. v. U.S.,
  435 U.S. 444 (1978) ......................................................................................12, 13

iv

N.Y. State Motor Truck Assoc.  v. Pataki,
    2004 U.S. Dist. LEXIS 25519 (S.D.N.Y. Dec. 16, 2004) ........................................................36

Nat'l Org. for Marriage, Inc. v. Walsh,
    714 F.3d 682 (2d Cir. 2013) ...........................................................................23, 33-34

Nat'l Park Hospitality Assoc.  v. Dep't of Interior,
    538 U.S. 803 (2003) .........................................................................3, 24, 25, 32

Nat'l R.R. Passenger Corp. v. City of New York,
    882 F.2d 710 (2d Cir.1989) .....................................................................12

New Orleans Steamship Assoc. v. Plaquemines Port, Harbor, & Terminal Dist.,
    874 F.2d 1018 (5th Cir. 1989) .................................................................14

New York Civil Liberties Union v. Grandeau,
    528 F.3d 122 (2d Cir. 2008) ...........................................................26, 28, 31, 33

Northwest Airline, Inc. v. County of Kent,
    510 U.S. 355 (1994) .............................................................................18, 19

Nutritional Health Alliance v. Shalala,
    144F.3d 220 (2d Cir. 1998) .......................................................................24

Ohio Forestry Assoc. v. Sierra Club,
    523 U.S. 726 (1998) .............................................................................30, 32

Packet Co. v. Keokuk,
    95 U.S. 80 (1877) ..................................................................................13

Plaquemines Port Harbor & Terminal District v. Fed. Mar. Comm'n,
    838 F.2d 536 (D.C. Cir. 1988)...................................................................15, 16

Public Service Com. v. Wycoff Co.,
    344 U.S. 237 (1952) ................................................................................33

Selevan v. New York Thruway Auth.,
    711 F.3d 253 (2d Cir. 2013) ......................................................................15

Simmonds v. INS,
    326 F.3d 351 (2d Cir. 2003) .............................................................22,  24,  30

U.S. v. Allegheny County,
    322 U.S. 174 (1944) ................................................................................12

U.S. v. City of Huntington, W.Va.,
    999 F.2d 71 (4th Cir. 1993) .......................................................................12

<u>U.S. v. Sperry</u>,
    493 U.S. 52 (1989) ................................................................................ 12, 16

<u>U.S. Nat'l Bank v. Independent Ins. Agents of Am., Inc.</u>,
    508 U.S. 439 (1993) ................................................................................ 33

<u>U.S. v. Leon</u>,
    203 F.3d 162 (2d Cir 2000) .................................................................... 33

<u>U.S. v. Salerno</u>,
    481 U.S. 739 (1987) ................................................................ 2, 20, 21, 26

<u>Village of Hoffman Estates v. Flipside Hoffman Estates, Inc.</u>,
    455 U.S. 489 (1982) ................................................................................ 20

<u>Wash. State Grange v. Wash. State Republican Party</u>,
    552 U.S. 442 (2008) ................................................................................ 21

<u>Zappia Middle E. Constr. Co. v. Emirate of Abu Dhabi</u>,
    215 F.3d 247 (2d. Cir. 2000) .................................................................. 23

**United States Constitution**

U.S. Const.
    Art. I, § 8, cl. 3 .......................................................................... 10, 13, 15
    Art. I, § 10, cl. 3 .............................................................................. 10, 14
    Article III .............................................................................................. 22
    Art. VI, cl. 2 ......................................................................................... 35

**Federal Rules of Civil Procedure**

Rule 12(b)(1) ................................................................................................ 1, 23

Rule 12(b)(6) ................................................................................................ 1, 21

**Federal Statutes**

33 U.S.C.
    § 5(b) .............................................. 2, 3, 10, 14, 16, 17, 19, 21, 35, 36, 37
    § 5(b)(1) ............................................................................................... 16
    § 5(b)(2) ......................................................................................... 16, 37

42 U.S.C.
    § 1983 .................................................................................................. 10

**State Statutes**

New York. Hudson River Park Act,  N.Y. CLS Unconsol. L., Chap. 65

    § 3 ....................................................................................................................... 6
    § 3(e) ................................................................................................................... 4
    §§ 5-7 .................................................................................................................. 5
    § 7 ....................................................................................................................... 6
    § 7(1)(d)(ii) ........................................................................................................ 5
    § 7(1)(j) .............................................................................................................. 6
    § 7(1)(k) ....................................................................................................... passim

   New York State Administrative Procedure Act

    § 202 ................................................................................................................... 5

New York Tax Law
    § 1115(43) .......................................................................................................... 6

## Preliminary Statement

Defendant Hudson River Park Trust ("the Trust") submits this memorandum of law, and the accompanying Declaration of Jaime Roth, Esq., dated February 21, 2014 ("Roth Dec."), in support of its motion to dismiss the complaint of plaintiffs New York Cruise Lines, Circle Line Sightseeing Yachts, Inc, and World Yacht, LLC ("plaintiffs"), dated November 14, 2013 (the "Complaint"), pursuant to Fed. R. Civ. P 12(b)(1) and (6), because plaintiffs' claims are unripe, lie outside the subject matter jurisdiction of this Court, and fail to state a claim upon which relief may be granted.

The Trust is responsible for operating the Hudson River Park (the "Park"), located on the waterfront on the west side of Manhattan between Tribeca and 59th Street. This suit challenges an amendment to the New York Hudson River Park Act, § 7(1)(k), enacted on November 13, 2013, which permits, but does not require, the Trust to promulgate a fee of up to two dollars to be paid by passengers on sight-seeing and other kinds of entertainment boats operating out of the Park.    At present, however, no fee under the new provision has been promulgated by the Trust; nor have terms for any such fee been proposed or determined, nor is any such proposal or promulgation imminent -- the Trust has not even established any time-line for the enactment of any such fee.   The Trust also has not determined what the amount of any such fee will be, for what purposes it will be used, or how it will be phased-in. Further, the Trust has not yet determined the administrative process by which it will promulgate any fee, although there would be a minimum of 60 days public notice, and ample opportunity for public comment and input, including input from the plaintiffs here, prior to any implementation of the fee.

Despite the fact that no fee has been proposed or enacted, plaintiffs, which

operate boats subject to the potential fee, seek a declaration that the new provision at issue should be invalidated and declared unenforceable because it (1) is unconstitutional under the dormant Commerce and Tonnage Clauses of the United States Constitution, and the related right to travel doctrine, and (2) violates and is preempted by a federal statute, a provision of the Maritime Transport Security Act of 2002 ("MTSA"), 33 U.S.C. § 5(b).   Plaintiffs' central allegation is that any fee that could be promulgated under the new statutory provision would be unconstitutional, illegal or preempted because it would not or could not be used in a manner consistent with the requirements of the federal constitution and MTSA, all of which require that such fees, based on a fact-specific analysis of the amount of the fee and its uses,  afford its payers services  concomitant with the amount of the fee paid.

Plaintiffs' claims, however, are either meritless or unripe. As set out at Point I of this memorandum,  plaintiffs' claims appear to be facial challenges to the new statute, because, even prior to the proposal or promulgation of any fee under the statute, the complaint seeks declarations that the statute is wholly unenforceable and unconstitutional, and that any fee enacted thereunder is invalid.  Complaint ¶¶ 68, 75, 82, 91, 93-98.  To set out such a claim for relief,  a plaintiff must make allegations supporting a claim that the statute is invalid in all its possible applications to any entity. United States v. Salerno, 481 U.S. 739 (1987).  Here, the allegations of the complaint do not support any claim of facial invalidity -- the complaint does not allege any factual basis for a claim that the statute,  which does not even require the Trust to enact any fee, could conceivably be unconstitutional in any and all potential  applications.  The complaint therefore should be dismissed.

In addition, as set out at Point II, construing plaintiffs claims as "as applied" challenges to the new statutory provision, that is, claims that the provision has not been or will not be applied constitutionally to the plaintiffs, plaintiffs' claims are unripe and not appropriate for judicial resolution.  Ripeness is both a constitutional and prudential doctrine. Under the prudential ripeness doctrine, in determining whether a claim is appropriate for judicial determination, a court considers two factors: the fitness of the issues for judicial review and the injury or hardship to the parties of withholding judicial consideration.  Where "further factual development" is needed in order to perform the required legal analysis, the case is not fit for judicial review. Nat'l Park Hospitality Assoc. v. Dep't of Interior, 538 U.S. 803, 811 (2003).  Under this standard,  the courts regularly reject requests for review of non-final, proposed, or ongoing regulatory enactments similar to plaintiffs' request here for review of a non-existent fee.

Very simply, the lack of any fee to review, its amount and its uses, renders plaintiffs' as-applied claim unripe. As set out below, at Point II B(1), in the absence of any fee, and a factual record of the amount and use of that fee, there is no practicable way, in light of the applicable legal standards, to address plaintiffs' claim that a fee enacted under the statute does not apply constitutionally or legally to them. In addition, (2), withholding judicial determination at this time poses no meaningful hardship to plaintiffs -- there is no fee, and withholding judicial consideration of a non-existent levy does not give rise to hardship, and, in any event, any fee will be subject to an administrative process in which plaintiffs themselves will participate before it is enacted, which the courts uniformly hold indicates that the claim is unripe.  In addition, (3), any injury to plaintiffs caused by a unenacted and non-existent fee is so attenuated -- so far

from imminent or real harm to plaintiffs -- that not only is prudential ripeness absent, but it appears that the as-applied claims are, at present, constitutionally unripe.

Finally, as set out in Point III, plaintiffs have also not set out a claim that the statute is preempted by MTSA § 5(b). Nothing in the new provision conflicts with the language or apparent purpose of MTSA. Moreover, to the extent plaintiffs allege that any fee that may <u>later</u> be promulgated under this provision is preempted because it will conflict with the MTSA, such a claim is unripe for the same reasons as plaintiffs' as-applied challenge to the Statute. Plaintiffs' suit is a premature attempt to challenge a non-existent fee, based on ungrounded assertions about such hypothetical fee's terms and uses. There is no legal basis or practical reason for the Court to retain jurisdiction over such claims.

### Statement of the Case

#### A. <u>The HRPA and The Trust</u>

In 1998, the New York Legislature enacted the Hudson River Park Act, NY CLS Unconsol. Ch. 65 (the "HRPA") (available on LEXIS), dedicated to promoting the improvement and development of the Hudson River Park (the "Park"), located on the far west side of Manhattan in New York City. A copy of the current version of the HRPA is annexed hereto for the Court's convenience as Exhibit A. The Park is the longest waterfront park in the United States, and was the largest open space project to be realized in Manhattan since the completion of Central Park. <u>See</u> *http://www.hudsonriverpark.org/about-us.* The Park includes both the land bordering the river on the west side of Manhattan between Battery Park City in Tribeca and 59th Street, as well as most of the bulkheads and piers attached to it. <u>See</u> HRPA § 3(e).

The Park is managed by the Hudson River Park Trust (the "Trust"), a partnership

between New York State and City.  The Trust has the authority to "plan, design, develop, construct, operate and maintain" the Park.  The composition, rights and obligations of the Trust are set out more particularly at HRPA §§ 5-7. See also *http://www.hudsonriverpark .org/about-us/hrpt* (describing Trust and its operations).

With regard to matters relating to planning, operation and development of the Park, the Trust is authorized to "provide for meaningful public notice, participation, consultation and review."  Id. § 7(1)(f).  Significant actions affecting the Park or community require public hearings given on at least 30 days published advance notice, as well as solicitation and consideration of the view of, among others, community groups, elected officials, and interested groups and individuals.  No less than 60 days may be allotted for public comment following notice of such proposed actions.  Id. § 7(6)(a)-(c). The Trust also possesses authority to enact rules and regulations, pursuant to the requirements of  the New York State Administrative Procedure Act ("SAPA").  See HRPA § 7(1)(d)(ii).  Under SAPA, prior to implementation, proposed rules may be subject to an extended schedule of proposal, public notice, hearings, public comment, agency response, review and revision.  See SAPA § 202.[1]

**B. The 2013 Amendments to the HRPA**

On November 13, 2013, the Legislature amended the HRPA, enacting the provision which plaintiffs challenge in this litigation.  A red-lined copy of those amendments is annexed hereto for the Court's convenience as Exhibit B.  The text of

---

[1] Meetings, agendae and minutes of public meetings of the Trust are posted online, as are requests for public comments, and the Trust's responses to those comments. See *http://www.hudsonriverpark.org/about-us/hrpt/board-of-directors/*.

the recent amendments, L. 2013, ch. 517 (November 13, 2013), is also available online at

*www.hudsonriverpark.org/assets/content/general/HRPA_Amendment_Chapter_517_of_*
*the_Laws_of_2013.pdf.*

The amendments to the HRPA clarified some of the commercial uses of the
Park. See Amendments to § 3 of the HRPA.   The amendments also included new
revnue-raising measures. Of most financial significance, the amendments permitted the
Park to transfer its unused air rights to properties located up to one block east of the
boundaries of the Park.   HRPA § 7(1)(j).

In addition to this provision, the amendment to the HRPA  gave the Trust the
option of enacting certain fees on some of the boats (but not the ferries) operating out
of the Park. The amended HRPA § 7(1)  gave the Trust the authority to:

> (k) establish, fix, revise, levy and collect or cause to be established, fixed
> revised levied and collected, a fee from each passenger traveling on a
> commercial passenger vessel of up to two dollars on each ticket other than
> those traveling aboard a ferry boat [a ferry boat is defined in New York
> Tax Law § 1115(43)[2]] which carries passengers for the primary purpose of
> entertainment, sightseeing, day or dinner cruises, and which embarks or
> disembarks at the boundaries of the Hudson River Park.

N.Y. CLS Unconsol. L., Ch. 65, § 7(1)(k) (available on Lexis) (the "Statute" or "§ 7(1)(k)").
As set out above, the amendments authorize (but do not require) the Trust to promulgate a
per-passenger fee of, at most, two dollars on passengers embarking on tour boats operated
by entities such as plaintiffs out of property managed by the Trust. The potential fee
permitted by the Statute is conceived of as a "trustee" fee, that is, the operators of those

---

[2] The boats subject to the exemption from any such fee are "[f]erry boats used directly
and predominantly to provide ferry service for vehicles and passengers within a county or
counties by a ferry company whose rates for that ferry service are regulated by the county
or counties in which that service is provided under section one hundred thirty-one-g of
the highway law. "  N.Y. Tax Law  § 1115(43).

vessels which are subject to the fee are responsible for collecting the fees from passengers and submitting such fees to the Trust.  Fees and returns related to any such fees are generally to be submitted quarterly.  Id. § 7(1)(k)(ii), (iii).

The Trust has not yet announced, published, or established any fee under the Statute.  Roth Dec. ¶ 9.  Nor has it determined in what amount it intends to do so, or when it intends to do so.  Id. ¶10.  It also has not decided or proposed the use or uses to which the proceeds of any such hypothetical fee would be put. Id. ¶ 11.  Nor has the Trust determined the process by which any fee would be phased in, for example,  how long after its enactment the fee would be required to be collected. Id. ¶ 12.  Indeed, the Trust has also not yet finally determined by which administrative process it would promulgate any such fee -- for example whether or not it would promulgate any such fee as a regulation under SAPA.  Id. ¶ 13. In any event, prior to promulgating any such fee, the Trust intends to consider the appropriate amount and best use of any such fee fully, and comply with all applicable legal provisions governing the establishment and  use of such fees. Id. ¶ 14.

Moreover, in considering the promulgation of any such fee, consistent with its statutory mandate, the Trust would solicit and respond to public comment, including the comments and requests of interested parties, such as the plaintiffs here, prior to establishing or phasing-in any such fee. Any public comment or notice period would be at least 60 days, although it could readily be longer, as set out above, depending on the administrative process employed, and the scope and nature of the particular issues and concerns to be addressed.  Id. ¶ 15.

The promulgation of the fee is not imminent at present.  At this time, the Trust does

not anticipate making any public proposals with regard to the potential fee for at least six months, and does not have any established deadline or outside date or dates by which it intends to propose or promulgate such a fee.  Id. ¶ 16.

## C. Plaintiffs' Lease

Plaintiff Circle Line holds a lease to certain portions of the Park. A copy of relevant portions of that lease, dated January 1, 2009,  is annexed to the Roth Declaration as Exhibit 1 (the "Lease").  The premises leased to Circle Line are Pier 81 and Pier 83 of the Park (the "Piers"), and the underwater land appurtenant to those piers, as indicated on schedule A to the Lease (which is part of Roth Dec. Ex. 1). See Ex. 1, at 11.  The areas leased do not include the Park surrounding the Piers, the driveways or pathways by which plaintiffs' customers and employees access the piers, or the bulkheads -- the fortified retaining wall along the shoreline -- to which the Piers  attach, and which support the Piers.  Roth Dec. ¶ 18.

Plaintiffs are generally responsible for some, but not all, of the repairs and maintenance associated with their and their customers' use of the Park. Specifically, Circle Lines, as tenant, is generally responsible for repairs and maintenance  to the leased Premises, that is, for the Piers and building and fixtures within the area of the Piers.  See Lease Section 16.01 (requiring  such repairs and maintenance to be performed by the tenant). Nothing in the Lease, however, precludes the Trust from maintaining or making improvements to the leased premises, to the extent they believe them necessary or appropriate.  Roth Dec. ¶ 21.

Moreover, plaintiffs' responsibility under the Lease is restricted to the premises as defined under the Lease.  It does not render plaintiffs responsible for any other portions

of the Park used by its business or customers.  For example,  plaintiffs are not responsible under the Lease for repairs, maintenance of or improvement to the bulkheads to which the Piers are attached, and which provide support to the Piers. Plaintiffs and their customers also  regularly use the surface of the bulkheads (which are not part of the leased premises) as a waiting area where their customers line up prior to boarding. Id. ¶ 20.  Plaintiffs and their customers also use the roadways, pathways, lighting, security, and other facilities in the Park, although plaintiffs have no obligation to maintain them.  Id. ¶¶18, 19.

**D. The Complaint**

    **1. Factual Allegations**

       Plaintiffs filed the instant declaratory judgment suit on November 14, 2013, the day after the enactment of the November 13, 2013 Amendments to the HRPA.   A copy of the complaint is annexed to the notice of motion for the Court's convenience.  The complaint alleges that plaintiffs operate sightseeing and entertainment cruises on the Hudson River and Harbor that begin and end in the Park.  Complaint ¶¶ 2, 9-12, 15, 17, 20.  Plaintiffs also allege that they lease Piers 81 and 83 from the Park, and operate their tours from there. Id.  ¶¶ 15-17.   Under their lease, plaintiffs are responsible for the leased property's insurance, maintenance, and security. ¶18.  Plaintiffs pay both monthly rent, and a percentage of its gross income to the Park under the terms of the Lease.  Id. ¶ 19.

       The complaint alleges that the recent HRPA amendments permit the Trust to promulgate a fee with regard to certain vessels. Id. ¶¶ 37-39.  However, the complaint does not allege that any fee, or any of its uses, pursuant to the recent amendments, has been announced, proposed, promulgated, or otherwise established, or that any fee under

the Statute has been sought or collected by the Trust in any manner from plaintiffs or any
other entity.  Plaintiffs aver that, despite the fact that the amount and usage of the fee are
wholly undetermined at this time, "on information and belief the fee will be used to
support the entire Hudson River Park's operation," and that the "fee will not support the
leased property, Plaintiffs' vessels, maritime security or any other costs associated with
the vessels or waters.  Plaintiffs are solely responsible for those costs."  Complaint ¶¶ 41,
42.

**2. Legal Claims**

Plaintiffs allege, claiming a violation of their civil rights under color of state law
pursuant to 42 U.S.C. § 1983,  that the Amendment to the HRPA, to the extent it permits
the Trust to enact a fee, violates their rights under the Tonnage and Commerce Clauses of
the Constitution, U.S. Const. Art. I, § 10, cl. 3 and § 8, cl. 3, the related constitutional
doctrine recognizing the right to travel, and a federal statute, 33 U.S.C. § 5(b), a
provision of the Maritime Transportation Security Act of 2002 (the "MTSA"), which
plaintiffs also claim preempts the as-yet undetermined and unenacted fee.

In essence, the complaint  alleges that any fee promulgated by  the Trust will,
regardless of its amount or use,  violate the cited provisions, or be preempted,  because it
will "greatly exceed the value of services rendered to or enjoyed by Plaintiffs or their
passengers."  See Complaint ¶¶ 5, 64-67, 79, 88 (all alleging that fee will be excessive in
relation to benefits conferred and therefore not comport with Constitution or MTSA); id.
¶ 73 (alleging preemption by MTSA). The  complaint  seeks  a declaration that  the
amendments to the HRPA violate the cited constitutional and statutory provisions, are
unconstitutional, preempted, unenforceable and invalid.  Complaint ¶¶ 68, 75, 82, 91, 93-

98.

## Legal Background

### A. <u>User Fees And Their Constitutionality</u>

The gravamen of the Complaint is that when and if the Trust enacts a fee under §
7(1)(k), it will not or cannot enact a fee that provides plaintiffs and/or their passengers
benefits concomitant with the amount of the fee.  The Constitution, however,  does not
usually limit the manner in which a State may designate the use of a particular monetary
levy.  As explained by the United States Supreme Court:  "nothing is more familiar in
taxation than the imposition of a tax upon a class or upon individuals who enjoy no direct
benefit from its expenditure and who are not responsible for the condition to be
remedied."  <u>Commonwealth Edison Co. v. Montana</u>, 453 U.S. 609, 622 (1981).

> The only benefit to which the taxpayer is constitutionally entitled is that
> derived from the enjoyment of the privileges of living in an organized
> society, established and safeguarded by the devotion of taxes to public
> purposes.  Any other view would preclude the levying of taxes except as
> they are used to compensate for the burden on those who pay them, and
> would involve abandonment of the most fundamental principle of
> government--that it exists primarily to provide for the common good.

<u>Id.</u> at 623 (citations omitted). Moreover, as further set out by the Court, courts are not
generally in the business of determining whether or not a particular tax is excessive in
relation to its subject matter or any particular benefit provided:

> The simple fact is that the appropriate level or rate of taxation is
> essentially  a matter for legislative, and not judicial resolution. . . .In
> essence, appellants ask this Court to prescribe a test for the validity of
> state taxes that would require state and federal courts, as a matter of
> federal constitutional law, to calculate acceptable rates or levels of
> taxation of activities that are conceded to be legitimate subjects of
> taxation.  This we decline to do.

<u>Id.</u> at 627-28 (citations omitted).  Thus,  a tax usually may be assessed by the Legislature

11

for any  public purpose–for general revenue, general welfare, the support of government, or other public uses.

In certain circumstances, however, the power to tax -- to levy for the common good without reference to who pays the tax, and who receives its benefit  -- is absent, for example where the Constitution, as is true under the Tonnage Clause, prohibits a non-federal entity from most forms of taxation of vessels.  In these circumstances, a levy for the purpose of paying for government services to the entity levied upon nonetheless remains constitutionally permissible.  Such levies are usually referred to as "fees" or "user fees." [3]  For example, in Mass. v. U.S., 435 U.S. 444 (1978), relying on the doctrine that the federal government cannot usually tax a state, Massachusetts claimed that the federal government had improperly "taxed" it, and challenged the assessment.  The Court, however, held that the levy at issue could properly be understood to be a permissible user fee because it met the requisite economic criteria for such fees, and it was therefore constitutional.[4]  As explained in Mass. v. U.S., such fees are constitutional, even where a

---

[3] What the enacting legislative body calls a particular assessment is not determinative of its nature or constitutionality. The United States Supreme Court has "consistently adhered to the general rule that what must be considered is the real nature of the tax and its effect upon the federal right asserted." U.S. v. City of Huntington, W.Va., 999 F.2d 71, 73 (4th Cir. 1993) (quoting U.S. v. Allegheny County, 322 U.S. 174 (1944)). The "label applied to an assessment. . . . does not determine whether the assessment is a tax or non-tax." National R.R. Passenger Corp. v. City of New York, 882 F.2d 710, 715 (2d Cir.1989).

[4] The question of whether a given enactment is a permissible "user fee" also arises, for example, in the context of claims that a given fund of monies held in trust for a private party by the government was "private property" which the government invaded without excuse, thereby unconstitutionally "taking" the funds under the Fifth Amendment. See, e.g., U.S. v. Sperry, 493 U.S. 52, 61-62 (1989) (holding percentage of funds held in frozen Iranian asset account to be constitutional and reasonable user fee for services supplied by Iranian Claims Tribunal because they were "fair approximation of costs of benefits supplied"). It is also of historic significance in the context of the dormant Commerce Clause, because at one time state taxation of interstate commerce was broadly prohibited (in a manner similar to the current operation of the Tonnage Clause). See

tax is not, because they do not interfere with the constitutionally valued activity which

provisions such as the Commerce Clause and Tonnage Clause protect:

> A clearly analogous line of decisions [to those considering whether the federal government improperly "taxed" a state] is that interpreting provisions in the Constitution that also place limitations on the taxing power of government. See, e.g., U.S. Const., Art. I, § 8, cl. 3 ([Commerce Clause] restricting power of States to tax interstate commerce); § 10, cl. 3 ([Tonnage Clause] prohibiting any state tax that operates "to impose a charge for the privilege of entering, trading in, or lying in a port." Clyde Mallory Lines v. Alabama ex rel. State Docks Comm'n, 296 U.S. 261, 265-266 (1935)). These restrictions, like the implied state tax immunity, exist to protect constitutionally valued activity from the undue and perhaps destructive interference that could result from certain taxing measures. The restriction implicit in the Commerce Clause is designed to prohibit States from burdening the free flow of commerce, see generally Complete Auto Transit, Inc. v. Brady, 430 U.S. 274 (1977), whereas the prohibition against duties on the privilege of entering ports is intended specifically to guard against local hindrances to trade and commerce by vessels. See Packet   Co.   v.   Keokuk,   95   U.S.   80,   85   (1877).

> Our decisions implementing these constitutional provisions have consistently recognized that the interests protected by these Clauses are not offended by revenue measures that operate only to compensate a government for benefits supplied. See, e.g., Clyde Mallory Lines v. Alabama, supra (flat fee charged each vessel entering port upheld because charge operated to defray cost of harbor policing); Evansville-Vanderburgh Airport Authority v. Delta Airlines, Inc., 405 U.S. 707 (1972) ($ 1 head tax on enplaning commercial air passengers upheld under the Commerce Clause because designed to recoup cost of airport facilities). A governmental body has an obvious interest in making those who specifically benefit from its services pay the cost and, provided that the charge is structured to compensate the government for the benefit conferred, there can be no danger of the kind of interference with constitutionally valued activity that the Clauses were designed to prohibit.

Mass. v. U.S., 435 U.S. at 462-63  (holding flat federal registration fee imposed annually

on all civil aircraft meets user fee standards and, as applied to state-owned aircraft, is

consistent with States' immunity from federal taxation).   Thus, under either the

---

American Trucking Assoc. v. Scheiner, 483 U.S. 266, 295-96 (1987) (explaining that prior, historic, approach to taxation under dormant Commerce Clause is now outmoded in favor of test set out by Complete Auto Transit Inc. v. Brady, 430 U.S. 274, 279 (1977).

Commerce Clause or Tonnage Clause, as well as in many other contexts, even where a tax is prohibited, a user fee is nonetheless permitted, provided it meets the standards for assessment of such fees.

**B. The Fact-Specific Test For User Fees Under the Tonnage Clause, Commerce Clause, Right to Privacy and MTSA**

The determination of whether a particular assessment is a constitutionally permissible user fee requires a factual examination of the amount of the levy, the nature of the service provided in return for the fee, the fee-payers use of that service, and the service's cost. The nature of this examination of the fee remains consistent across the various constitutional and statutory provisions invoked by plaintiffs: the Tonnage Clause, Commerce Clause, right to travel, and MTSA.

The Tonnage Clause of the United States Constitution, U.S. Const. Art. I, § 10, cl. 3, provides that "[n]o State shall. . .lay any Duty of Tonnage." The Tonnage Clause generally prohibits of taxation of vessels by the States. The provision "prohibits. . .dues to raise general revenues." Bridgeport and Port Jefferson Steamboat Co. v. Bridgeport Port Authority, 567 F.3d 79, 88 (2d Cir. 2009) ("Bridgeport"). As held by the Supreme Court:

> The prohibition against tonnage duties has been deemed to embrace all taxes and duties regardless of their name or form. . .which operate to impose a charge for the privilege of entering, trading in, or lying in a port. But it does not extend to charges made by state authority, even though graduated according to tonnage, for services rendered to and enjoyed by the vessel, such as pilotage, or wharfage, or charges for the use of locks on a navigable river.

Clyde Mallory Lines, 296 U.S. 261, 265-66 (1935) (emphasis added). See, e.g., id. (permitting flat fee against vessels used to fund policing service at port available to all vessels); New Orleans Steamship Assoc. v. Plaquemines Port, Harbor, & Terminal Dist.,

874 F.2d 1018, 1023 (5th Cir. 1989) (fee on vessels permissible when imposed in order to make emergency services available to all using port); Plaquemines Port Harbor & Terminal District v. Fed. Mar. Comm'n, 838 F.2d 536, 545 (D.C. Cir. 1988) (fee permissible when used to support emergency services); Hawaiian Navigable Waters Pres. Soc'y v. State of Hawaii, 823 F. Supp. 766, 776 (D. Haw. 1993) (fee permissible when charged to defray cost of restroom facilities, parking, trash disposal and security services); Camara De Mercadeo v. Vazquez, 2013 U.S. Dist. LEXIS 150275 (D. P. R. Oct. 16, 2013) (fee assessed to cover cost of providing security scanning system for port was constitutional as to parties who had access to the scanners, but not as to those who did not); Bridgeport & Port Jefferson Steamboat Co. v. Bridgeport Port Auth., 566 F. Supp. 2d 81, 102 n.32 (D. Conn. 2008) (under Tonnage Clause, fee on ferry passengers could permissibly have been used for purposes such as construction of the Ferry Terminal, access road, and parking garage), aff'd, 567 F.3d 79 (2d Cir. 2009).   Benefits must be "apportioned as closely as is practicable" to the fee paid. Bridgeport, 567 F.3d at 88 (citing Plaquemines, 838 F. 2d at 545 n.8), and services supplied must be available to all fee payers, even if all do not use them.   Id. (citing Clyde Mallory Lines, 296 U.S. at 266).

Similarly, under both the dormant Commerce Clause, U.S. Const. Art. I, § 8, cl. 3, and right to travel doctrine, a user fee will be upheld if: (1) it does not discriminate against interstate commerce; (2) is based on a fair approximation of use or privilege for use of the facilities for whose benefit it is imposed; (3) is not excessive in comparison with the government benefit conferred or in relation to the costs incurred by the charging authority. Bridgeport, 567 F.3d at 83-84; Selevan v. New York

Thruway Auth., 711 F.3d  253, 258-59 (2d Cir. 2013) (same analysis applies in considering user fees under the right to travel as Commerce Clause).  There need not, however, be a perfect fit between the use of the facilities and the support of those facilities by the fee.  Bridgeport, 567 F.3d at 86 (citing U.S. v. Sperry Corp., 493 U.S. 52, 60 (1989)); cf. Plaquemines, 838 F. 2d at 545 n.8 (under Tonnage Clause, fit need only be as exact as "practicable").   Moreover, a user fee may reasonably support the budget of a governmental unit that operates facilities that bear a "functional relationship" to facilities used by the fee payers.  Bridgeport, 567 F.3d at 87 (citing Automobile Club of New York, Inc. v. Port Authority, 887 F.2d 417, 421 (2d Cir. 1989) (where all services supplied by New York/New Jersey port authority, including tunnels, bridges and PATH train were interrelated, cost of PATH could be included in base rate of tolls, that is, a user fee charged by the port authority on  bridges and tunnels).

The MTSA, 33 U.S.C. § 5(b), in turn, "codified the existing Commerce Clause jurisprudence with respect to user fees." Bridgeport, 566 F. Supp. 2d at 102-03 (recognizing that MTSA "closely tracks the Commerce Clause and Tonnage Clause cases," and also observing that "it is unclear whether there is a private right of action" under the MTSA).  Under  MTSA § 5(b)(1),  non-federal authorities may not assess taxes, fees, or tolls on vessels operating on the United States' navigable waters. Nonetheless, under  § 5(b)(2), non-federal authorities may permissibly levy fees consistent with the Commerce and Tonnage Clauses.  That provision excepts fees from the scope of the fees and taxes prohibited by that provision that:  (A) are used to pay cost of service to the vessel; (B) enhance the efficacy of commerce, and (C) do not impose

more than a small burden on interstate commerce. 33 U.S.C. § 5(b) (2).[5]

Thus, each of the constitutional and statutory provisions relied on by plaintiffs imposes a similar fact-specific test to determine whether an imposition amounts to a permissible "user fee." Applying any of these provisions, the permissibility of a fee will turn on a factual examination of the amount of the fee levied and received, the government costs it is intended to defray, and the nature and cost of the services provided to the party paying the fee.

Bridgeport, 567 F.3d 79, the primary case around which plaintiffs appear to have framed their complaint, provides a recent example of the particularized, fact-based examination required by the Constitution to test the permissibility of a user fee under all the various provisions and doctrines on which plaintiffs rely. There, the Bridgeport Port Authority ("BPA") enacted a fee on a passenger ferry; the ferry line, and several of its passengers, sued Bridgeport claiming that the fee violated the dormant Commerce

---

[5] There is almost no legislative history relating to the reasons for the inclusion of this provision in MTSA, a statute which was quickly passed after the events of 9/11, and otherwise addresses post-9/11 maritime security measures. However, as part of the Conference Report on the bill, the Alaska Representative indicated that the purpose of the provision was to assure that vessels not docking, but making their way through a state's waters, had the same standards apply to them, consistent with the Commerce Clause, as docking vessels. See Conference Report on S1214, Congressional Record, November 22, 2001 at E2143 (stating that Congress wanted to assure that treatment of transiting vessels was consistent with Commerce Clause treatment of docking vessels, and avoid unnecessary litigation over the issue); Conference Report, House of Representatives, Report No. 107-77, at 107 (noting that provision was not in original House or Senate bill, and was added in conference, and stating that "this provision does not prohibit those instances in which Federal law has permitted the imposition of fees and recognizes those circumstances which Federal law under which non-Federal interests may charge reasonable port and harbor fees for services rendered"). All of this indicates that, as observed by the district court in Bridgeport, the statute was intended to codify existing constitutional standards, and clarify that they applied to vessels at sea, as well as those landing at a given location, not to change federal standards, or create new private rights of action. See Bridgeport, 566 F. Supp. 2d at 102-03.

Clause, the Tonnage Clause, the right to travel, and the MTSA.   The fee at issue, along with the rents received by the BPA, was more than sufficient to pay for, and funded, all of BPA's operations, which included many things that did not even arguably benefit the plaintiff passengers or the ferries used by them.   Id. at 83 (the BPA "used the revenue from the passenger fee. . .to pay for essentially all of its operating expenses. . . including all salaries, health benefits, pension payments, payroll taxes, telephone, utilities, office equipment, travel, charitable contributions and automobile and lease expenses").

The district court also found, as a matter of fact,  that some of the activities of the BPA benefitted plaintiffs, including construction and maintenance of a new ferry building, repair of the bulkhead of the dock, construction of the access road, planning of the parking facility, dock security services, and other daily operations related to the ferry. Id. at 79. Other activities, however, funded by the fee did not benefit the ferry, including certain separate development projects unrelated to the ferry service, commercial shipping activities on nearby land, BPA review of projects within the same general district, and other miscellaneous items such as registration of trademarks. Id. at 84.

Accordingly, applying the dormant Commerce Clause test set out in Evansville-Vanderburgh Airport Authority District v. Delta Airlines, Inc., 405 U.S. 707, 716-17 (1972), as refined by Northwest Airline, Inc. v. County of Kent, 510 U.S. 355 (1994), to these facts, the district court found, and the Circuit affirmed, that the "fair approximation" and "excessiveness" prongs of the three-part Commerce Clause and right to travel test had not been met because the

> passenger fee supports virtually the entirety of BPA's operating budget. If, as the District Court ruled, some of the BPA's expenses confer no benefit on the ferry passengers, either enjoyed or available to be enjoyed, then to that extent the fee, imposed solely on ferry passengers, is not a fair

approximation of the use of the facilities supported by the fee and is also excessive in relation to the benefits enjoyed or available to be enjoyed by the passengers.

Id. at 86.  The court further explained that "the limits of both a fair approximation of use and excessiveness are plainly exceeded when the fees support a BPA budget that includes, for example, a development project for reducing traffic on I-95. . . .Such quality-of-life improvements cannot be said to confer an actual or potential benefit to the ferry passengers." Id.

In addition,  the Second Circuit found that a closer question was posed by the use of the fee for dredging of the harbor and a pump-out service for pleasure boats, because the use of the fee in this manner did provide a benefit to the ferry boat passengers. However, the "fair approximation of use" portion of the test was not met because there was no indication in the record of what proportion of the dredging fees were borne by the ferry passengers, as opposed to the other boats using the harbor, who benefited more directly from the dredging and pumping services.  The district court therefore found, and the Circuit upheld, that the fee was unconstitutional to the extent it required payment for services that did not benefit the ferry passengers, and should be reduced to the extent it exceeded what was necessary to pay for the benefits to the ferry passengers. Id. at 85, 88 (affirming finding of district court).

Turning to the Tonnage Clause, the analysis by the district court and Second Circuit followed from that endorsed under the Commerce Clause and right to travel. Because the fee was "used for the impermissible purpose of raising general revenues and for projects which do not and could not benefit the ferry passengers," and to provide services "completely unrelated and unavailable to the fee payers" the fee was found to

have been properly held by the district court to violate the Tonnage Clause. Id. at 25.

In addition, although the Circuit Court did not discuss this issue, the district court observed that the MTSA analysis would be essentially the same as that under the Commerce and Tonnage Clauses. It, however, declined to reach the issue. 566 F. Supp. at 102-03.

Thus, each of the claims made by plaintiffs here relating to the legality or constitutionality of any fee that may one day be promulgated under the HRPA turns on a particularized, fact-based examination of the amount of the fee, and the nature and cost of the services provided to the plaintiffs in return for that fee.

## Argument

## Point I

## THE COMPLAINT DOES NOT SET OUT A VIABLE FACIAL CONSTITUTIONAL CHALLENGE TO § 7(1)(k)

Statutes are ordinarily challenged, and their constitutionality evaluated, "as applied" -- that is, the plaintiff contends that application of the statute to the plaintiff in the particular manner in which the government has applied it is unconstitutional. See, e.g., Diaz v. Paterson, 547 F.3d 88, 101 (2d Cir. 2008). The practical effect of holding a statute unconstitutional "as applied" is to prevent its future application in the same or a similar context, but not to render it utterly inoperative. Ada v. Guam Soc'y of Obstetricians & Gynecologists, 506 U.S. 1011 (1992). By contrast, to invalidate and render a statute wholly unenforceable, the plaintiff must succeed in challenging the statute "on its face." Id. A facial challenge is a claim that a law is invalid "in toto" -- and therefore incapable of any constitutional application. Village of Hoffman Estates v. Flipside Hoffman Estates, Inc., 455 U.S. 489, 494, n.4 (1982).

Under <u>U.S. v. Salerno</u>, 481 U.S. 739 (1987), a plaintiff can only succeed in a facial challenge by "establish[ing] that no set of circumstances exists under which the Act would be valid," <u>i.e.</u>, that the law is unconstitutional in any and all potential applications to any and all entities. <u>Id.</u> at 745. <u>See</u> <u>Wash. State Grange v. Wash. State Republican Party</u>, 552 U.S. 442, 449-51 (2008) (<u>U.S. v. Salerno</u> standard remains correct one in cases raising facial constitutional challenges to statutes under provisions other than the First Amendment); <u>Dickerson v. Napolitano</u>, 604 F.3d 732, 741-42 (2d Cir. 2010) (same); <u>Cranley v. Nat'l Life Ins. Co.</u>, 318 F.3d 105, 110 (2d Cir. 2003).

In the present matter, even prior to the proposal or promulgation of any fee, plaintiffs seek a "judgment declaring that the amended HRPA is in violation of the Tonnage Clause," "in violation of the Commerce Clause and right to travel," and preempted by the MTSA and therefore "unconstitutional and invalid." <u>See</u> Complaint ¶¶ 93-98. Plaintiffs also seek declarations that the Statute is "unenforceable." <u>See</u> Complaint ¶¶ 68, 75, 82, 91. Thus, the complaint, at base, raises a facial challenge to the Statute -- a claim that it is wholly unenforceable, even though it has never been implemented in any fashion.

The plaintiffs, however, altogether fail to allege how § 7(1)(k), which does not mandate the promulgation of any fee, specify the amount, or otherwise indicate the means of its establishment, calculation or use, is facially invalid under the standard set out in <u>U.S. v. Salerno</u>. Plaintiffs do not make factual allegations to support a claim that the Statute cannot apply constitutionally under any circumstances to any party. Plaintiffs therefore entirely fail to set out any factual basis for a facial challenge to §7(1)(k), or for

the relief sought by them, and the complaint must be dismissed under Rule 12(b)(6) for failure to state a cause of action.

**Point II**

**ANY AS-APPLIED CLAIM MUST BE DISMISSED BECAUSE IT IS UNRIPE**

To the extent plaintiffs here intended to plead an "as-applied" challenge to the Statute, seeking to invalidate the assessment of a non-existent fee on plaintiffs' own operations, and speculating "on information and belief" as to any fee's potential and hypothetical uses, the complaint must be dismissed because it is unripe.

**A. Plaintiffs Have the Burden of Proving Ripeness**

Ripeness is both a constitutional prerequisite to exercise of jurisdiction by the federal courts, and a prudential doctrine intended to assure that federal courts do not entangle themselves resolving disputes unnecessarily, or when further factual development would be useful to a determination of the legal issues. See Abbott Labs v. Gardner, 387 U.S. 136, 148-49 (1967), overruled on other grounds by Califano v. Sanders, 430 U.S. 99 (1977). The ripeness doctrine embraces "two overlapping threshold criteria for the exercise of a federal court's jurisdiction" Simmonds v. INS, 326 F.3d 351, 356-57 (2d Cir. 2003).

> Both [forms of ripeness] are concerned with whether a case has been brought prematurely, but they protect against prematureness in different ways and for different reasons. The first of these ripeness requirements has as its source the Case or Controversy Clause of Article III of the Constitution, and hence goes, in a fundamental way, to the existence of jurisdiction. The second is a more flexible doctrine of judicial prudence, and constitutes an important exception to the usual rule that where jurisdiction exists a federal court must exercise it.

> These two forms of jurisdiction are not coextensive in purpose. Constitutional ripeness is a doctrine that, like standing, is a limitation on

22

the power of the judiciary.  It prevents courts from declaring the meaning of the law in a vacuum and from constructing generalized legal rules unless the resolution of an actual dispute requires it.   But when a court declares that a case is not prudentially ripe, it means that the case will be *better* decided later, and that the parties will not have constitutional rights undermined by the delay.  It does not mean that the case is not a real or concrete dispute affecting cognizable current concerns of the parties within the meaning of Article III.  Of course, in deciding whether "better" means later, the court considers the likelihood that some of the parties will be made worse off on account of the delay.  But that, and its degree, is just one - albeit important - factor the court must consider.  Prudential ripeness is, then, a tool that courts may use to enhance the accuracy of their decisions and to avoid becoming embroiled in adjudications that may later turn out to be unnecessary or may require premature examination of, especially, constitutional issues that time may make easier or less controversial.

Id. (internal citation and quotation omitted);   Nat'l Org. for Marriage, Inc. v. Walsh, 714

F.3d 682, 687-88 (2d Cir. 2013) (same).

A plaintiff asserting subject matter jurisdiction has the burden of proving by a

preponderance of the evidence that it exists.  Makarova v. U.S., 201 F.3d 110, 113 (2d

Cir. 2000);  Malik v. Meissner, 82 F.3d 560, 562 (2d Cir. 1996).  This rule applies equally

to the prudential ripeness doctrine.  See, e.g., Marchi  v. Board of Cooperative Education

Services of Albany, 173 F.3d 469, 478 (2d Cir. 1999).  In addition, on a 12(b)(1) motion

to dismiss for lack of subject matter jurisdiction,  such as a motion to dismiss because a

claim is unripe,  a court may resolve any disputed facts by referring to evidence outside

of the pleadings. Makarova, 201 F.3d at 113; Zappia Middle E. Constr. Co. v. Emirate of

Abu Dhabi, 215 F.3d 247, 253 (2d Cir. 2000).

**B. Plaintiffs' As-Applied Claims Are Unripe**

**1.  Plaintiffs' Claims Are Not Fit For Determination Because They Require
    A Fact-Specific Analysis Of  The Terms And Use Of A Non-Existent Fee**

The prudential portion of the doctrine of ripeness is intended "to prevent the courts,

23

through avoidance of premature adjudication, from entangling themselves in abstract disagreements over administrative policies, and also to protect the agencies from judicial interference until an administrative decision has been formalized and its effects felt in a concrete way by the challenging parties." Abbott Labs, 387 U.S. at 148; Nat'l Park Hospitality Assoc. v. Dep't of the Interior, 538 U.S. 803, 807-08 (2003).  In determining whether a declaratory judgment action, such as the present one, is ripe a court considers (1) the fitness of the issues for judicial review and (2) the injury or hardship to the parties of withholding judicial consideration. Connecticut v. Duncan, 612 F.3d 107, 113 (2d Cir. 2010) (citing Abbott Labs, 387 U.S. at 149).  Both aspects of the "inquiry involve the exercise of judgment, rather than the application of a black-letter rule." Id. at 113 (citing Nat'l Park Hospitality Assoc., 538 U.S. at 814). The basic question before the Court in the context of a determination of prudential ripeness is whether  "[plaintiffs'] claims would better be heard now or at some point in the future." Simmonds v. INS, 326 F.3d 351, 359 (2d Cir. 2003).

The analysis of whether a declaratory judgment action is "fit" for determination turns on whether "consideration of the underlying legal issues would necessarily be facilitated if they were raised in the context of a specific attempt to [apply and/or] enforce" the law at issue. Nutritional Health Alliance v. Shalala,144 F.3d 220, 225 (2d Cir. 1998). Where "further factual development"  would facilitate the required legal analysis, the case is not appropriate for judicial review. National Park Hospitality Assoc., 538 U.S. at 811; Entergy Nuclear Vt. Yankee, LLC v. Shumlin, 733 F.3d 393, 430 (2d Cir. 2013).  The "fitness analysis is concerned with whether the issues sought to be adjudicated are contingent on future events or may never occur." Simmonds, 326 F.3d at 359 (internal

24

citation and quotation omitted) (emphasis added).  Moreover, these "ripeness principles .
. . bear heightened importance when, as in the present case, the potentially unripe
question presented for review is a constitutional question.  If there is one doctrine more
deeply rooted than any other in the process of constitutional adjudication, it is that we
ought not to pass on questions of constitutionality. . .unless such adjudication is
unavoidable. " Connecticut v. Duncan, 612 F.3d 107, 113 (2d Cir. 2010) (citation and
quotation omitted).

 Under this analysis, claims challenging administrative regulations, policies or
interpretations of policies that are not certain or final are not deemed "fit" for judicial
review.  For example, in Isaacs v. Bowen, 865 F.2d 468, 477-78 (2d Cir. 1989), plaintiff
class action representatives contended, inter alia, that certain proposed changes to the
Medicare regulations, which altered the hearing procedures for administrative review of
Medicare determinations, violated the government's statutory authority, and the plaintiffs'
due process rights.  Id. at 470.  The Second Circuit held that the claim was unripe,
explaining that "[t]his attack is directed at possibilities and proposals only, not at a
concrete plan which has been formally promulgated and brought into operation." Id. at
477.  As explained by the Court of Appeals, the matter was not ripe for adjudication
because the "issues sought to be adjudicated are contingent on future events." Id. at 478.
"The. . .plans are simply proposals subject  to change in light of congressionally-
authorized studies and other serious concerns. . .Were we to rule, decisions properly
made by the administrative agency might be foreclosed or limited." Id.

 Along the same lines, in New York Civil Liberties Union v. Grandeau, 528 F.3d
122 (2d Cir. 2008), the Second Circuit held that where an  administrative policy was not

sufficiently well-established or certain, a constitutional challenge to that policy was unripe. There, plaintiff NYCLU disputed whether its expenses related to use of a billboard were required to be reported as lobbying expenses under a New York statute, claiming that such reporting would violate the First Amendment. Id. at 126-27. The Court found that there was a "live dispute about what constitutes reportable activity" under the applicable statute, and how broadly the Commission could interpret the reporting requirement under the First Amendment. Id. at 130. However, Justice Sotomayor, writing for the Second Circuit, nonetheless found the case to be unripe under the prudential ripeness doctrine, because the Commission policy challenged was not "sufficiently definite and clear to permit sound review by the Court." Id. at 132-33   The court observed that "judicial review. . . would certainly benefit from additional factual development and is in many ways contingent on future events, such as an inquiry by the Commission into activity that the NYCLU deems non-lobbying advocacy." Id. at 133. Therefore, the court reasoned that the policy was not yet fit for review by the court because "we would be forced to guess at how [the defendant] might apply the [challenged] directive and to pronounce on the validity of numerous possible applications of the directive, all highly fact-specific and, as of yet, hypothetical." Id. at 134 (citing and quoting Marchi, 173 F.3d at 479 (alteration in original)).

In Entergy, 733 F.3d 393, the Second Circuit considered the ripeness of  a Commerce Clause challenge to administrative action, in that case  a proposed agreement by Vermont to purchase power (a "PPA"). Plaintiff power plant owners alleged that the PPA unconstitutionally favored in-state retail utilities, and had the illegal effect of controlling commerce outside the boundaries of the state.  Vermont intended to enter into

such a PPA, but the PPA had not yet been finalized. Id. at 100. The Circuit found that because the PPA had not been finalized, the court did not have the ability to consider the factual terms and real-world effects of the proposed PPA, which would be necessary to address the legal substance of the plaintiffs' claims. Id. at 430-31. The court reasoned that "without evidence regarding the PPA's effect on out-of-state power consumers, we cannot determine whether the PPA will have a direct impact on commerce in other states. We also do not have a factual record concerning incidental effects of such an agreement on interstate commerce and the commensurate benefits of the agreement." Id. at 430. In addition, in dismissing, the Court held that claim was constitutionally unripe. Id. at 431. See also, e.g., In re Drexel Burnham Lambert Group, Inc., 995 F.2d 1138, 1146 (2d Cir. 1993) (challenge to plan to distribute specified fund, claiming plan violated consent order, was premature when it was not yet clear whether and how regulatory agency would determine to distribute funding).

As demonstrated by the extensive analysis of the factual record in Bridgeport, plaintiffs' claims relating to the unconstitutionality or illegality of a purported "user fee" turn on a fact-specific consideration of the amount of the fee, and of the services provided to plaintiffs and their passengers as a result of the fee. These claims are not currently "fit for judicial consideration" under the first prong of the ripeness test because, as a practical matter, there is no factual basis upon which the Court may decide the substance of plaintiffs' claim. Rather, they are "contingent on future events." The plaintiffs' challenge to the hypothetical uses of a non-existent fee is therefore unripe. See, e.g., Isaacs, 865 F.2d at 477 (challenge to proposed regulation dismissed as unripe where it was directed at "possibilities and proposals only, not at a concrete plan which has been formally

promulgated and brought into operation" and proposals could change); Entergy, 733 F.3d at 430-31 (challenge to non-final agreement dismissed as constitutionally unripe where lack of final agency action prevented court from considering factual issues relevant to claim, including benefits of agreement and its effect on out-of-state commerce); NYCLU, 528 F.3d at 124 (challenge to policy implementing statute dismissed as unripe where actual policy was unclear, and court, in attempting to resolve claim, would be "forced to guess at how [the defendant] might apply the [challenged] directive and to pronounce on the validity of numerous possible applications of the directive, all highly fact-specific and, as of yet, hypothetical").

Plaintiffs, however, apparently mean to claim that the Lease, which places the responsibility for repairs and maintenance to some (but not all) portions of the Park used by them and their customers ripens their claim. See Complaint ¶ 42 (alleging that plaintiffs are solely responsible for repairs and maintenance of the leased property and their vessels and "on information and belief" that the fee will not support "the leased property, Plaintiffs' vessels, maritime security, or any other costs associated with the vessels or waters"); Plaintiffs' Pre-motion Letter at 3 (claiming that plaintiffs' obligation of repair and maintenance of premises under Lease means that there are no constitutionally permissible uses to which any fee could be put).

This argument, however, is a legal red herring. The Lease in no way determines whether any particular fee, collected in return for a service provided to plaintiffs, would be justified under the applicable constitutional test. The Lease does not require the Trust to forbear from providing any services to plaintiffs or their vessels or their customers, or from making improvements to the Park (for example, to the bulkheads, which are not

party of the Premises) regardless of whether or not plaintiffs are generally responsible for any portion of such costs themselves.[6]   Rather, the legal question before the Court has nothing to do with the terms of plaintiffs' lease -- the question is whether a fee is justified by as yet unidentified services or benefits to plaintiffs.  Without an actual fee, and any services or benefits to consider, this combined question of fact and law cannot readily be addressed by the Court; rather, the Court would be forced to speculate --without any factual record -- about possible and hypothetical uses of the as-yet undetermined fee.[7]  See Marchi, 173 F.3d at 479 (court should not be forced to "pronounce on the validity of numerous possible applications of the [law], all highly fact-specific and, as of yet, hypothetical ").   This is  a textbook example of an instance where further factual development is essential to resolution of the issues before the Court, and the complaint should be dismissed.

**2. Dismissal At This Time Would Not Impose Any Significant Hardship On Plaintiffs**

Applying the second element of the prudential test for ripeness, there is no imminent hardship to plaintiffs from withholding judicial consideration of the issues here

---

[6] Although the Lease requires plaintiffs to maintain the subject property, nothing in the Lease prevents the Trust from determining to use the proceeds of the fee to maintain or improve plaintiffs' leased property. Thus, for example, the fee could be used, hypothetically, to make important and useful improvements to the leased property in a manner that plaintiffs themselves could not accomplish, absent the proceeds of the fee. In addition, nothing in the Lease prevents the Trust from using the constitutionally appropriate portion of the fee to improve or maintain other parts of the Park used and relied on by plaintiffs and their customers.

[7] While plaintiffs may claim that their passengers would not receive sufficient benefit relative to the hypothetical fee for any hypothetical uses of the fee, and/or that such unidentified services are not permitted to be compensated for by a "user fee," clearly these questions are best determined on factual record, after the promulgation of the fee, and after its uses have been determined, and not based on abstract speculations about its possible uses.

until such time as some fee has been announced and finalized. "The mere possibility of future injury, unless it is the cause of some present detriment, does not constitute hardship." <u>Simmonds</u>, 326 F.3d at 360.

The Supreme Court and Second Circuit have repeatedly held that the determination of a court not to review a policy or practice, which, like the hypothetical fee challenged by plaintiffs here, is unimplemented, undefined, may change, or is subject to an administrative study and process prior to implementation, does not give rise to a "present detriment" or hardship to a plaintiff sufficient to warrant immediate review.  In <u>Ohio Forestry Assoc. v. Sierra Club</u>, 523 U.S. 726 (1998), the Sierra Club challenged a forestry plan, contending that its provisions violated the National Forest Management Act of 1976, in particular because it authorized certain logging practices and proposals. The plan, however, although it authorized the challenged practices, required additional administrative action before it fully authorized any actual logging.  The plan, did, however, make logging more likely, in that the plan was a precondition for such logging. <u>Id.</u> at 926-27.

Applying the two-part ripeness analysis, the Court determined that the plaintiff's claim was unripe.  The Court, in particular, found that there was no "significant practical harm" posed by the adoption of the plan, since various administrative steps remained before it was put into effect, and the plaintiff would have ample time to bring a challenge when harm is "more imminent and more certain."  Moreover, as set out above, the Court noted that premature review of the plan could hinder agency efforts to refine its policies through administrative process, revisions, or application in practice.  <u>Id.</u> at 735-36. In addition, the Court found that consideration of the issue would embroil it in potential

administrative plans in a way not generally suited to the judiciary. Id. at 736-37.   See also, e.g., NYCLU, 528 F.3d at 134 (showing of hardship absent judicial resolution of claim -- that is, demonstration that the "challenged action creates a direct and immediate dilemma for the parties"-- was absent where actual interpretation and enforcement of challenged policy by administrative agency remained unclear); Connecticut v. Duncan, 612 F.3d at 114-15 (showing of hardship absent where plaintiff state, who sought to challenge federal government's rejection of state's proposed plan to comply with requirements of the No Child Left Behind Act, faced no imminent enforcement action, and remained free to propose a new plan through the administrative process in which it was engaged with federal government; the ripeness doctrine was intended to protect the agency's interest in "crystallizing  its policy before that policy is subject to judicial review"; completion of the administrative process was proper prior to judicial review because it would allow parties together to "design an amended plan" that would satisfy both sides, a process that could moot the lawsuit ").

Under the analysis set out in these cases, there exists little hardship to plaintiffs if their claims are not heard now.  First,  there is no fee, and the promulgation of a fee is not imminent, rendering immediate review of a non-existent fee unnecessary. Moreover, any proposed fee will be subject to a public administrative process in which plaintiffs will participate, and administrative consideration and modification, as appropriate, prior to its implementation. See Roth Dec.¶¶ 3, 4, 14, 15.  Indeed, the fee at issue here is even less final, and the claim of hardship more tenuous, than in Ohio Forestry, where the existence of a proposed logging plan was held to pose no imminent hardship to the plaintiffs -- there, at least, an initial  plan had been formulated and proposed publicly. Moreover,

31

here, as in cases such as <u>Connecticut</u> and <u>Ohio Forestry</u>, administrative study and review must be completed prior to the proposal of any fee, further attenuating any claim of immediate hardship absent judicial review at this time -- and indicating that judicial review would be inappropriate, because the issues are subject to administrative development, consideration, revision and resolution.   Under these circumstances, a determination not to review the hypothetical fee at present would not pose any meaningful hardship to plaintiffs, and this Court can, and should, postpone decision on the merits of the present matter to a time when the factual issues are more fully developed.[8]

### 3. The Claim that the Statute Is Unconstitutional As Applied Is Also Constitutionally Unripe

Not only would postponing the determination of plaintiffs' claims relating to the application of the fee to them not impose any significant hardship on plaintiffs,

---

[8]   Plaintiffs argue in their pre-motion letter that a need for business planning constitutes sufficient hardship to ripen their claims; that is, they claim that they will need notice of whether or not any fee may be implemented, regardless of its terms, so that they can plan for it. Plaintiffs' Pre-Motion Letter at 4.  However, plaintiffs' claim of hardship relating to its business activities because it needs notice of the potential implementation of any fee (regardless of its terms or use) for planning purposes makes little sense.  Plaintiffs already have notice of the potential implementation of the fee. They also know its implementation is not imminent, and that there will be an administrative process prior to implementation.  What is more, no fee has yet been established or proposed, and plaintiffs have the ability to participate in the planning process to make sure that it will not be implemented in a manner, or on a schedule,  which creates practical problems. This renders their claim unripe. <u>See</u> <u>Connecticut</u>, 612 F.3d at 115  (no sufficient showing of hardship from withholding judicial review where plaintiffs would engage in administrative process which could change or moot issues before court); <u>Ohio Forestry Assoc.</u> 523 U.S. at 736-37 (no sufficient hardship to plaintiff shown where premature review by court would hinder agency efforts to refine policy, and embroil Court in administrative process); <u>Nat'l Park Hospitality Assoc.</u>, 538 U.S. at  811 (no meaningful hardship posed to plaintiff where plaintiff claimed review of unenforced agency rule was necessary for business planning and economic purposes; "if we were to follow petitioner's logic, courts would soon be overwhelmed with requests for what essentially would be advisory opinions").

indicating that the Court need not reach these issues at this point, but any claim of current injury to plaintiff from the application of the Statute is, at this point, so strained that constitutional ripeness appears also to be absent.  Under Article III of the Constitution, the judicial power of the federal courts is limited to "cases" or "controversies." The exercise of federal jurisdiction under the Constitution "depends on the existence of a case or controversy, and a federal court lacks the power to render advisory opinions." U.S. v. Leon, 203   F.3d 162, 164 (2d Cir 2000) (quoting and citing U.S. Nat'l Bank v. Independent Ins. Agents of Am., Inc., 508 U.S. 439 (1993). "Such differences of opinion or conflicts of interest must be ripe for determination as controversies over legal rights. The disagreement must not be nebulous or contingent but must have taken on fixed and final shape so that a court can see what legal issues it is deciding, what effect its decision will have on the adversaries, and some useful purpose to be achieved in deciding them." Public Service Comm. v. Wycoff Co., 344 U.S. 237, 243-44 (1952) (internal quotation omitted).

    In light of these principles, constitutional ripeness, considered under Article III of the Constitution, is closely related to the standing doctrine.

> Often, the best way to think of constitutional ripeness is as a specific application of the actual injury aspect of Article III standing. The "irreducible constitutional minimum of standing contains three elements": (1) "the plaintiff must have suffered an injury in fact," i.e., "an invasion of a legally protected interest which is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical"; (2) "there must be a causal connection between the injury and the conduct complained of"; and (3) "it must be likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." Lujan v. Defenders of Wildlife, 504 U.S. 555, 560-561. . . (1992) (quotation marks, citations, alterations, and footnotes omitted). Constitutional ripeness, in other words, is really just about the first Lujan factor—to say a plaintiff's claim is constitutionally unripe is to say the plaintiff's claimed injury, if any, is not "actual or imminent," but instead "conjectural or hypothetical."

Nat'l Org. for Marriage, Inc. v. Walsh, 714 F.3d 682, 688 (2d Cir. 2013) (footnote omitted); New York Civil Liberties Union v. Grandeau, 528 F.3d 122, 130 n.8 (2d Cir. 2008) ("Standing and ripeness are closely related doctrines that overlap most notably in the shared requirement that the plaintiff's injury be imminent rather than conjectural or hypothetical") (quotation marks, citation and alterations omitted).

Where a potential policy has not yet been administratively finalized or undertaken and there is, as a result, no real, defined or identifiable injury to plaintiff, constitutional ripeness is absent. See, e.g., Entergy, 733 F.3d at 430-31 (claim was constitutionally unripe where action challenged under Commerce Clause had not been finalized, preventing court from considering its actual terms and effects); Clearing House, LLC v. Cuomo, 510 F.3d 105, 124 (2d Cir. 2007) (determination of court not to reach claim seeking declaration that New York State Attorney General lacked authority to enforce federal statute, which Attorney General claimed it had authority to enforce, but had not yet enforced, "did not result in any direct or immediate consequences and did not require plaintiffs to alter their primary conduct in any way"; challenge to such claimed authority was therefore constitutionally unripe).

Nothing about the statute at issue, as it currently exists, requires plaintiffs to take any action, or to refrain from any action, "to alter their conduct in any way," or in any manner subjects them to imminent liability. This is not just a pre-enforcement challenge, it is a pre-enactment challenge. Accordingly, not only is the as-applied claim prudentially unripe, but, also, because there is no fee and no actual or imminent injury to plaintiffs caused by the Statute alone, there is also no Article III jurisdiction over these claims.

34

## POINT III

## THE CLAIM OF PREEMPTION IS MERITLESS AND UNRIPE

### A. Plaintiffs' Preemption Challenge to the Statute Fails to State A Claim

Under the Supremacy Clause of the United States Constitution, federal law "shall be the supreme law of the land; and the judges in every state shall be bound thereby, anything in the constitution or laws of any state to the contrary notwithstanding." US Const. Art. VI, cl. 2. Therefore, when "a state statute conflicts with, or frustrates, federal law, the former must give way." CSX Transp., Inc. v. Easterwood, 507 U.S. 658, 663 (1993). However, "[c]onsideration under the Supremacy Clause starts with the basic assumption that Congress did not intend to displace state law." Maryland v. Louisiana, 451 U.S. 725, 746 (1981)

Where there is no express preemption provision in a federal law, a state law "can be pre-empted in either of two general ways." Cal. Coastal Com v. Granite Rock Co., 480 U.S. 572, 581 (U.S. 1987). First, "[i]f Congress evidences an intent to occupy a given field, any state law falling within that field is pre-empted." Id. (citations omitted). Second,

> If Congress has not entirely displaced state regulation over the matter in question, state law is still pre-empted to the extent it actually conflicts with federal law, that is, when it is impossible to comply with both state and federal law,…or where the state law stands as an obstacle to the accomplishment of the full purposes and objectives of Congress…"

Id. (citations omitted). Here, there is no basis for a finding that, in enacting the MTSA, Congress intended to "occupy the field" with regard to the enactment of state user fees. Nor is there any reason to believe that § 7(1)k by its terms and on its face conflicts with

the MTSA, or "stands as an obstacle to the accomplishment of its purpose."  Rather, even though MTSA § 5(b) prohibits certain taxes, the federal law at issue also specifically permits state authorities to establish fees consistent with the standards for such fees under the Commerce and Tonnage Clauses.  Bridgeport, 566 F. Supp. 2d at 102-03 (recognizing that terms of MTSA "closely track[] the Commerce Clause and Tonnage Clause cases").  Moreover, nothing about §7(1)(k) indicates that it must be understood as contrary to the purposes of MTSA § 5(b) -- which was, apparently, to codify the Commerce Clause standard, and assure that it applied to all vessels, regardless of whether or not they docked in a given port, and to prevent unnecessary litigation over this issue.  See n. 5, supra.(setting out legislative history of MTSA § 5(b)).  Thus, a claim that MTSA § 5(b) wholly preempts the Statute, which does not even require any fee to be imposed, must fail for similar reasons as petitioner's facial challenge to the statute: nothing in the terms of the statute or its purpose stands as an obstacle to the accomplishment of MTSA's aims.  The Statute therefore is not preempted.  See, e.g., N.Y. State Motor Truck Assoc. v. Pataki, 2004 U.S. Dist. LEXIS 25519, * 11, *22  (S.D.N.Y. Dec. 16, 2004)  (claim that New York statute relating to shipping of cigarettes was  wholly unconstitutional and preempted under the Supremacy Clause is subject to test for facial unconstitutionality under U.S. v. Salerno; because statute's enforcement would not necessarily impede or frustrate goals of federal statute, State statute was not wholly preempted). [9]

---

[9] High Country Adventures, Inc. v. Polk, 2008 WL 4853105 (Tenn. Ct. App. Nov. 10, 2008), on which plaintiffs rely to claim that they have alleged a viable claim that, even absent any promulgation of a fee, the statute is preempted, Plaintiffs' Pre-motion Letter at 5, does not support their position here. That case held that  a duly enacted and enforced local tax on passengers rafting on a Tennessee river-- not a hypothetical and

**B. Plaintiffs' Claim that the Application of the Statute to It Is Preempted By Or Violates MTSA Is Unripe**

Moreover, the question of whether the MTSA preempts (or prohibits) any specific fee that may later be enacted under the Statute is unripe for the same reason that plaintiffs' constitutional as-applied claims are unripe: the fee and its use have not been determined. Plaintiffs' argument relating to the application of MTSA § 5(b) to the fee are based on assumptions and speculation -- not on the terms of an enacted fee. See Complaint ¶¶41, 42. In Building Trades Employers' Educ. Assoc. v. McGowan, 2000 U.S. Dist. LEXIS 14270, *9, fn. 3, (S.D.N.Y. 2000), plaintiffs made a similar preemption argument premised on their claimed certainty with regard how the Labor Department would act, which the district court rejected:

> According to plaintiffs, "just as it is certain that the Labor Department will condition approval of the Apprenticeship Program on Local 3's assent, it is equally certain that the Labor Department will consider, as an alternative basis for rejection, Local 3's [prior] allegations that the Plaintiff Contractors violated the NLRA." (Pl. Mem. at 21) This argument is premised on plaintiffs' speculation about what the Department will do if and when plaintiffs' application is processed. Because the Department has not yet rendered a decision with respect to plaintiffs' pending application, plaintiffs' . . . preemption argument is not ripe.

Id. Because the Trust has not established the fee or determined its use, plaintiffs' preemption argument, as applied to any potential fee, is similarly based on assumption

---

unpromulgated user fee -- was preempted. Moreover, the defendant county there expressly admitted that the tax did not fall within the language of the exception to the prohibition on taxation of vessels set out in MTSA § 5(b) because the tax "was not used solely to pay the cost of a service to a vessel or water craft on the Ocoee river." Id. at *10. That is not the present case; here there is no tax, only an unpromulgated user fee, and there is no indication that such a fee would necessarily conflict with the terms of § 5(b). Thus, nothing in the reasoning of High Country indicates that the statute at issue here, which does no more than authorize a fee, can be found to be wholly and automatically in conflict with and preempted by MTSA.

37

and speculation, and should thus be dismissed as unripe for the same reasons as the as-applied constitutional claims. When no fee has been enacted, and its amount and uses have not been determined, the Court need not, should not, and cannot perform an effective review the legality of that hypothetical fee.

## CONCLUSION

For the foregoing reasons, defendant Hudson River Park Trust respectfully requests that the Complaint be dismissed in its entirety, and the Court grant such other and further relief as it deems just and equitable.

Dated: New York, New York
          February 21, 2014

Respectfully submitted,

ERIC T. SCHNEIDERMAN
Attorney General of the
   State of New York
Attorney   for   Defendant   Hudson
River Park Trust
By:

Elizabeth A. Forman (1272)
Assistant Attorney General
120 Broadway, 24th Floor
New York, New York 10271-0332
(212) 416-8538